**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GROUPCHATTER, LLC, | CIVIL ACTION FILE |
| Plaintiff, | |
| v. | |
| GENERAL ELECTRIC COMPANY, GE ENERGY MANAGEMENT SERVICES, INC., and GE GRID SOLUTIONS, LLC, | NO. 1:16-cv-00486-WSD [LEAD CASE] |
| and | |
| LANDIS+GYR TECHNOLOGIES, LLC and LANDIS+GYR TECHNOLOGY, INC., | NO. 1:16-cv-00711-TCB |
| and | |
| ITRON, INC. | NO. 1:16-cv-01800-WSD |
| Defendants. | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff GroupChatter, LLC files this First Amended Complaint against Defendants General Electric Company, GE Energy Management Services, Inc. and GE Grid Solutions, LLC (collectively, "GE") for infringement of: U.S. Patent Nos. 7,969,959; 8,199,740; 8,588,207; and 9,014,659.

## THE PARTIES

1.     Plaintiff GroupChatter, LLC ("GroupChatter") is a Texas limited liability company with its headquarters and principal place of business at 1400 Preston Road., Suite 475, Plano, Texas 75093.

2.     Defendant General Electric Company is a New York corporation with its principal place of business at 3135 Easton Turnpike, Fairfield, CT, 06828-0001. General Electric Company may be served through its registered agent CT Corporation, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

3.     Defendant GE Energy Management Services, Inc., is a Delaware corporation with its principal place of business at 4200 Wildwood Pkwy Bldg 2018, Atlanta, GA 30339.  GE Energy Management Services, Inc., may be served through its registered agent CT Corporation, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

4.     Defendant GE Grid Solutions, LLC is a Delaware corporation with its principal place of business at 4200 Wildwood Pkwy Bldg 2018 N6-04A-03, Atlanta, GA 30339.  GE Grid Solutions, LLC may be served through its registered agent CT Corporation, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

5.     GE has appeared and answered.

## JURISDICTION AND VENUE

6.     GroupChatter brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). Defendant does business in this judicial district, has committed acts of infringement in this judicial district, has purposely transacted business in this judicial district involving the accused products and/or, has regular and established places of business in this judicial district.

8.     Defendants are subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long-Arm Statute, due at least to its substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Texas residents.

## GROUPCHATTER PATENTS

9.     GE infringes, directly and indirectly, the following patent claims: '959 Patent claims 1, 2, 3, 8, 10, 13, 14, 17, 18, 20, 21, 29, and 30; '740 Patent claims 1,

2, 3, 4, 5, 10, 11, 12, 13, 14, 15, 20, and 21; '207 Patent claims 1, 2, 3, 8, 9, and 11; and '659 Patent claims 1, 2, 3, 4, 8, 10, 11, 12, 13, and 16 (the "GE Asserted Claims").

10.     The GE Asserted Claims relate to methods, apparatuses, and systems for providing acknowledged, deterministic group messaging over a two-way wireless network.  Broadly speaking, GroupChatter accuses GE of infringement based upon GE's provision, management, operation, and deployment of wireless networks that perform deterministic group messaging, for example, by broadcasting wireless messages to a group of smart utility meters (e.g., electric meters), tracking responses (or lack of responses) from them, and providing up-to-the-minute status of the utility grid.

11.     The GE Asserted Claims describe a specific two-way communication system with a network architecture and addressing scheme providing a novel way to perform deterministic group messaging.

12.     "Deterministic" group messaging refers to one of the advantages delivered by the inventions.  Using the claimed system offers the potential benefit of providing timely updates for endpoints within a group.  In operation, endpoints (e.g., meters, pagers) send responses to group messages and thereby provide data from which to determine the status of each endpoint.

13.    The inventors noted in the specification's Background of the Invention section that in the realm of public safety communication networks, for example, a communication system comprised of endpoints capable of acknowledging group messages fails to provide the valuable advantage of deterministic communication because such a system provides no structure or capability to maintain status of each group member, leaving an administrator lacking important data about the status of the endpoint group.

14.    To solve this problem and other shortcomings of prior two-way wireless messaging networks, the inventors conceived a novel combination using a group addressing scheme for use on a wireless two-way network and described in the GroupChatter Patents how to build and deploy the network architecture to use it and achieve its benefits.

15.    In the GE Asserted Claims, grouped endpoints are identified by at least two addresses—a unique primary identifying address and at least one group address.  In addition to the two-way, point-to-multipoint wireless architecture of the radio network, a client/server-based architecture is provided for communication between a network client and the two-way wireless network.

16.    Through the access provided via the client/server end of the communication network, a user is provided group information that may include

address information, status information pertaining to a message or command response, overall group detail and status, or even specific information about endpoints within a group.

17. In operation, an exemplary embodying system stores for each recipient endpoint, a device-specific address, one or more group-specific addresses, and group membership data that identifies which recipients belong to specific groups. An endpoint may belong to multiple groups and thus may be associated with multiple group addresses.

> *A group message, which is addressed to a group address and initiated via a network client, is wirelessly broadcast to endpoints located within the range of the wireless network infrastructure. Endpoints are configured to receive a broadcast group message based upon endpoint address information. An advantage of the claimed addressing system is demonstrated in operation of the claimed invention by reference to and communication with selected endpoints and groups of endpoints using identifying addresses (the primary and group addressing scheme discussed above) rather than alternative methods requiring extensive additional network infrastructure or tuning in order to effectively locate, communicate, and track the endpoints across the network area.*

FIG. 1 of the '959 Patent (reproduced below) depicts in general terms a network that embodies one or more claims:



FIG. 1

18.   As shown, exemplary structural elements for an embodied system include: (1) a network client 20; (2) a network switch or server 12 coupled to a receiver database 18; (3) a wireless network 14; and (4) a plurality of mobile receivers 16 (e.g., pagers, meters, etc.).

19.   As background, the inventors conceived the subject matter of the patents-in-suit in part to address issues in communication networks of the day.  For example, some radios and associated wireless networks used by emergency responders were unable to handle the heavy network traffic that circumstances unfortunately required.   The "Background of the Invention" section of the specification states:

> "during the events of Sep. 11, 2001, radio channels became oversaturated, and interoperability problems among jurisdictions and agencies persisted throughout the entire response process. Otherwise compatible portable radios were preprogrammed in a manner that precluded interoperability. Cellular telephone systems and even the public switched telephone network (PSTN) became congested and unusable."

20.    During the September 11 tragedy, older pager systems proved more reliable than cell phone networks.  But while pager-based systems had the potential to be relatively robust in emergency circumstances, such systems of the time were unable to efficiently process group messages (i.e., messages to groups of recipients) and track the individual responses to know which members of the group had responded.  The Background of the Invention states:

> *"none of these systems provide a network interface sufficient to support acknowledged group messaging. Requiring that the message originator individually alert each recipient adds considerable setup delay when alerting large groups."*

21.    Accordingly, the inventors conceived the invention(s) to address these problems.  The result was a novel system that efficiently used limited bandwidth and network resources to effectively communicate with selected endpoints groups whose membership may be dynamically created and adjusted.

22.    In order to achieve their objectives, the inventors derived a novel addressing scheme and new ways of sending acknowledgements to group messages on a wireless network.   As noted in the Specification, at the time of the inventions existing two-way wireless messaging protocols (e.g., the ReFLEX protocol) did not permit acknowledgements sent to groups of endpoints, for example:

*"ReFLEX™ supports personal and information service (IS) messages. Personal messages involve a single recipient, and ReFLEX™ enables the receiving pager to acknowledge reception, notify that the user has read the message, and relay multiple-choice responses from the user. IS messages involve an arbitrary group of recipients sharing common group addresses called IS addresses. ReFLEX pagers can be configured with one personal address and multiple IS addresses. IS messages are strictly one-way and ReFLEX™ does not support any response or acknowledgement from the recipient group. The present invention, however, adds message acknowledgement, message read notification, and multiple-choice response capability to IS messages, creating an infrastructure for reliable multicast messaging within the ReFLEX™ protocol. As described further below, the present invention implements two significant changes to conventional 2-way paging. First, it defines a new ALOHA command ('Multicast ACK Command') used by a pager to reply to an IS message. Second, it defines a flag to select which devices are allowed to use this feature."*

23.    Again, the GE Asserted Claims relate to, among other things, a specific network architecture that includes: wireless network (e.g., a cellular network) infrastructure (e.g., base stations, backhaul, transmitters, receivers, antennae, and central switch), multiple transceivers (e.g., utility meters equipped with two-way wireless communication modules for communicating on the wireless network), and at least one network client (e.g., a computer running network access software) that can communicate with a network element in the server role (e.g., the network server/controller or switch).

24.    In addition to and across this network infrastructure and architecture,

the GE Asserted Claims further relate to a particular addressing scheme conceived to provide network efficiency by allowing wireless messages (e.g., commands, requests, updates) to be readily sent to several endpoints using a group address.

25.     The subject matter of the system and method claims asserted against GE are tied to the structural deployment described above as claimed in the GroupChatter Patents.

26.     In operation, the GE Asserted Claims set forth additional requirements.  A message originator, who may lack knowledge of specific details regarding a particular endpoint group, is provided group information via a network client.  Such information may include membership information for each group, the number of recipient endpoints having a selected group address, or identifying addresses of recipient endpoints within a group and sharing a selected group address.

27.     The claims recite a specific method for providing this information. The GE Asserted Claims describe and recite the source of group and recipient endpoint information, how and when it is transmitted to a network client, and how it may be displayed and updated at the network client.

28.     In an example scenario where an incident commander is seeking assistance over a pager network, a notification feature can provide the commander

(i.e., the message originator) details about the number, identities, and statuses of group members.  Using the invention for this feature, the commander is able to determine based upon the group messaging system information, a status of group members.  Without this feature, an incident commander may have insufficient context to know whether enough personnel were being summoned, or whether key individuals had been mobilized.

29.    In the GE Accused System, similar scenarios present ways in which GE and GE's customers leverage the advantages of the claimed subject matter. Up-to-the-minute status information for endpoint groups is important in an GE Accused System, in order to allow the customer utility visibility into current usage that enables it to control equipment and allocate scarce utility resources based upon near real-time needs.

30.    By using the claimed addressing scheme described in the GroupChatter Patents, GE and other infringers are able to communicate to ad hoc or dynamically organized groups of endpoints for reads and pings to assess the utility grid and pinpoint outages.

31.    Additional meaningful claim elements in the GE Asserted Claims include: (1) providing membership information to the message originator (e.g., "transmitting a communication to the network client…"); and (2) keeping the

message originator updated regarding which endpoints have acknowledged receipt of the group message (e.g., "…providing the acknowledgment responses to the network client").  In previous systems, referring again to the incident commander's scenario for example, after a volunteer group was alerted by pager, the incident commander would not know who was going to respond until personnel began to arrive on scene.  In contrast, with the claimed "deterministic" group messaging systems, incident commanders (or utility network engineers or operators) are updated in response to the group messages dispatched.  Responses are linked to endpoint recipients within the group context, an advantage and novel advancement achieved by the inventive addressing scheme.  In this way, the inventive systems and methods provide a valuable concrete result: deterministic status information provided to a network client for groups of endpoint recipients across a two-way wireless communication network.

33.    Accordingly, the GE Asserted Claims are directed to a specific two-way wireless architecture appended with a client/server modeled network client and employing a particular addressing scheme for identifying with and selectively communicating with endpoint recipients across the network.  The Asserted GE Claims are not directed to an abstract idea.

33.    Acknowledged group messaging may be performed in ways and

across architectures that differ from the claimed subject matter. While the advantages of the inventions likely will not be achieved, two-way messaging with selective groups of endpoints may be performed using other methods such as frequency division across the geographical region or focused transmission, encryption, or having multiple radios in the network infrastructure.

34.    The GE Asserted Claims provide structure and limit the invention to particular and novel ways of deterministically messaging selective groups of recipients on a two-way wireless communication network. These structural limitations describing architecture, integrated computer-based operations necessary to practice the patent claims (e.g., database tables, communication at network client with server/switch), wireless network protocol capable of communicating address information in multicast/broadcast signals, and endpoints that can receive and interpret those signals provide meaningful structural limitations that one of skill in the art would recognize as distinctions between network types.

35.    The operations, function, and results of the subject matter of the GE Accused Products cannot be carried out and achieved by a human or generic computer.

36.    The operations, function, and results of the claimed subject matter recited in the GE Accused Products cannot be carried out and achieved using a

generic two-way wireless radio network.

37.    Generic computer networks or wireless two-way radio networks do not perform "group communication and response tracking" as that general concept is claimed in the GE Asserted Claims.

38.    The GE Asserted Claims require specific hardware, endpoint addresses, data flow, operations, network architecture, and deployment in order to perform the "group communication and response tracking" as that function is claimed.

39.    Some of the major advantages of the claimed systems and advances over the prior art are discussed in the specification (minimizing network latency, tracking endpoints and their relationships with groups, effectively communicating with multiple endpoints in groups, tracking delivery across a network by group, and conserving bandwidth).  One skilled in the art at the time of the inventions would further recognize additional advantages including efficient use of bandwidth through use of group messaging and addressing as taught in the GroupChatter Patents, minimizing load on the wireless network, collision avoidance, centralized administration of endpoints and groups coupled with thinned network clients, simplified endpoints that do not require sophisticated radio equipment to communicate with multiple subnets on the wireless network.

40.    By the novel combination of its two-way wireless network architecture, client/server interface network, group addressing scheme, and deterministic messaging functionality, the GroupChatter Patents present a specific, inventive solution to the problem the inventors recognized with messaging networks at the time of their invention.

41.    In addition to the above-discussed alternatives to the invention, for providing deterministic messaging, maintaining status of endpoint recipients may potentially be achieved exclusively by periodic, one-way transmissions from endpoint recipients to the wireless network head end system.  Such a hypothetical system may flood the communication channel(s) with endpoint and the access point transmissions.  Staggering such transmissions to reduce collisions would result in long busy periods on the network and high congestion.  Such a system would burden the endpoints, network infrastructure, and may not provide the demand response capabilities GE values and the claimed subject matter delivers. And rather than adopt such hypothetical systems for its AMI Grid IQ AMI system, GE adopted the more robust feature set achieved by utilizing the architecture, data flow, components, and functionality described in the GE Asserted Claims.

## THE GE GRID IQ AMI SYSTEM

42.    Defendants' Grid IQ is an Advanced Metering Infrastructure (AMI)

system that is used to measure, collect and analyze energy usage and interact with advanced devices such as electricity meters, gas meters, heat meters, and water meters, through various communication media either on request (on-demand) or on pre-defined schedules.

43.     Grid IQ infrastructure includes hardware, software, communications, consumer energy displays and controllers, customer associated systems, Meter Data Management (MDM) software, supplier and network distribution business systems, etc.

44.     Grid IQ is a point to multipoint solution that provides wireless two-way communication to a utility's metering assets.

45.     Grid IQ also can monitor multiple distribution-sensing applications, such as smart meters, transformers, fault circuit indicators and other grid assets, under one unified network, accelerating the utility return on investment.

46.     By gathering data from all of these devices using Grid IQ and the claimed subject matter of the asserted patents, a utility can use its back-end applications to monitor and analyze the data to improve grid reliability and outage prevention, while reducing costs associated with installing additional infrastructure and performing routine maintenance on networks for multiple, different applications.

47.     Grid IQ is an end-to-end system capable of communicating to a group of devices.



48.     Aspects of the Grid IQ AMI system are detailed below and should be understood to apply to all of the asserted patents as if included in each count.

## COUNT I
## (INFRINGEMENT OF U.S. PATENT NO. 7,969,959)

49.     GroupChatter incorporates paragraphs 1 through 51 herein by reference.

50.     GroupChatter is the owner, by assignment, of U.S. Patent No. 7,969,959 (the "'959 Patent"), titled "METHOD AND APPARATUS FOR

EFFICIENT AND DETERMINISTIC GROUP ALERTING."

51.　　A true and correct copy of the '959 Patent is attached as Exhibit A.

52.　　As the owner of the '959 Patent, GroupChatter holds all substantial rights in and under the '959 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

53.　　The United States Patent Office granted the '959 Patent on June 28, 2011.

54.　　The '959 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

55.　　Defendant has no consent or authorization to practice the '959 Patent.

56.　　GE provides hardware, firmware, software, and other items purchased or licensed from GE.  Hardware includes for example, collectors, transmitters, and endpoints.  Accused instrumentalities include GE Grid IQ AMI systems, Grid Solutions, Grid IQ AMI P2MP Solution, GE's MDS wireless product portfolio, MDS PulseNET, GE Grid IQ Connect SaaS, Grid IQ Connect, GE Wireless AMI, Grid IQ Network Communications Platform, RF Mesh, Smart Grid Communications Solutions, Communications Infrastructure for Grid Applications, MDS Orbit Platform, SMOS Smart Metering Operations Suite, GE Digital Energy

Grid IQ Solution, GE DRMS and related or analogous systems (collectively referred to herein as Grid IQ, GE Grid IQ AMI, GE System(s) or similar terms). Accused Instrumentalities further include storage (e.g., servers, databases, etc.,), programs (e.g., applications, etc.), hardware (e.g., transmitters, repeaters, collectors, communication modules, endpoints) referred to herein (by way of example) that relate to the patent claims as outlined herein to provide customers with AMI products, services, and solutions.  Accused Instrumentalities for the four asserted patents include GE Grid IQ AMI systems and related subsystems (e.g., Grid Solutions).

57.    Accused Instrumentalities for each asserted patent include GE's Smart Metering System that employ meter with two-way communication capability to collect and transmit meter data to support various applications and distribution automation. Generally, GE refers to these systems as Grid IQ.

58.    The Accused Instrumentalities include components, associated systems, and subsystems identified by name and functionality detailed in GroupChatter's infringement claim charts and any other GE messaging system having the same relevant functionality and components identified by Plaintiff in its infringement contentions.  These include: Grid IQ AMI System with subsystems and components including RF Mesh components, Smart Metering Operations

Suite, Grid IQ Connect, Grid IQ Network Communications Platform, access points, subscriber units, and endpoints.

59.    GE offers Grid IQ Solutions as a Service.  This offering utilizes GE-owned Smart Grid software and hardware technologies and strategic partnerships to provide meters and metering services, AMI meter data management, pre-payment Outage Management (OMS), Interactive Voice Response (IVR) and Geospatial Informaiton System (GIX) as pre-integrated standard packages. Accused Instrumentalities include AMI integrations by GE and Landis+Gyr Technologies, LLC and Landis+Gyr Technology, Inc. ("Landis+Gyr") as shown below:

## AMI Integrations
### Factory integrated AMI communication options for kV2c/kV2c+

GE's kV2c and kV2c+ meters are integrated with a wide variety of AMI communication modules.  GE is constantly seeking to provide diverse solutions suitable for each customer's AMI needs.  The following table summarizes current factory installed communication options.

| AMI Technologies | Type | kV2c | | kV2c+ | |
|---|---|---|---|---|---|
| | | 120-480V | 120-480V EPS | 120-480V | 600V |
| Aclara® (UMT-C) | PLC | x | | | |
| Itron (53ESS ERT®) | RF (AMR), 900 MHz | x | | x | x |
| L+G Gridstream® (TS1/TS2) | PLC | x | | | |
| L+G Gridstream (Command Center) | RF Mesh, 900MHz | | x | | |
| L+G Gridstream (UtiliNet Solution Center) | RF Mesh, 900MHz | x | | | |
| Sensus (FlexNet®) | RF (Tower-based) | x | | | x |
| Silver Spring Networks® (NIC) | RF Mesh, 900 MHz | | x | | |
| Trilliant CDMA (CellReader®) | Cellular | | x | | |
| Trilliant GPRS (CellReader) | Cellular | | | x | x |
| Trilliant (SecureMesh™) | RF Mesh, 2.4 GHz | | x | | |

60.    Landis+Gyr and GE strive for compatibility among subsystems and accordingly Accused Instrumentalities include hardware jointly provided by

Landis+Gyr and GE.  GroupChatter asserts direct and indirect infringement against GE based on AMI deployments that use components provided by combinations of these three defendants.

61.   GE is practicing one or more claims of the '959 Patent, including at least claims 1, 2, 3, 8, 10, 13, 14, 17, 18, 20, 21, 22, 29 and 30, by making, using, offering for sale, selling, and/or importing components and systems for alerting groups of recipients over a wireless network.

62.   GE has directly infringed and continues to infringe the '959 Patent by practicing, without limitation, the methods of claims 1, 2, 3, 8, 10, 13, 14, 17, 18, 20, 21, 22, 29 and 30 by deploying, testing, and operating a wide area Advanced Metering Infrastructure (AMI) network that enables remote configuration, operation, and monitoring of utility meters in the Grid IQ AMI System.

63.   GE indirectly infringes the asserted claims of the '959 Patent by contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System (e.g., hardware and software) to customers such as utility companies that make and use embodied systems with the component parts.

64.   The Grid IQ AMI System components provided by GE are special-purpose components with specific features for deterministic group communication as recited in the asserted claims.   These components with deterministic group

communication features are not a staple article or commodity of commerce suitable for substantial non-infringing use.

65.    Hardware and software in the GE Grid IQ AMI Systems for performing deterministic group communication is dedicated to that function and has no other use of any significance.

66.    Group managers on endpoints store group membership data and analyze inbound group messages targeting a particular group of meters.  If the meter belongs to the target group, it executes the direct load control function and acknowledges the group message.  The group manager has no substantial non-infringing use.

67.    At the head end system, a Grid IQ data aggregator implements group management of meter endpoints.

68.    Once groupings are implemented, the Grid IQ data aggregator can implement data transmission directives (e.g., public pricing messages), data collection directives (e.g., daily use data), or other directives from the head end system as a broadcast or multicast signals that address a group of utility meters.

69.    The Grid IQ data aggregator's group messaging components at the head end system have no substantial non-infringing use.  They are designed and used to perform deterministic group messaging as recited in the asserted claims.

70.     GE knowingly induces others, namely GE's customers such as gas, water, and electric utilities, to infringe the asserted claims by encouraging, aiding, and abetting the use, deployment, assembly, installation, and operation of the accused Grid IQ AMI System and components.

71.     GE has been aware of the GroupChatter Patents and how the Grid IQ AMI system infringes the asserted claims at least since the filing of this suit and has had specific knowledge of its infringing conduct. Despite having such knowledge, GE continues to sell infringing Grid IQ AMI Systems and components and induce, deploy, encourage, aid, and abet others to directly infringe the asserted claims of the '959 Patent.

72.     Grid IQ AMI System is a blend of smart meters, software and communications infrastructure that combines individual features of an AMI system to deliver business value to utilities.

73.     The Grid IQ AMI System consists of subsystems and components including RF Mesh components, Smart Metering Operations Suite, Grid IQ Connect, Grid IQ Network Communications Platform, access points, subscriber units, and endpoints.

74.     The Grid IQ AMI System operates with endpoints (e.g., electric meters) that have communication modules.

75.   Grid IQ AMI System endpoints are identified by device ID, endpoint ID, serial number and/or network address.

76.   Endpoints in Grid IQ AMI Systems are organized in groups.

77.   Endpoints in the Accused Instrumentalities are addressable as a group or individually.

78.   Grid IQ grouping function utilizes meter groupings defined by a metering system aat the head end system to partition the actual meters into one or more groups.

79.   A single Grid IQ meter may belong to a plurality of groups.

80.   GE utilizes the Grid IQ grouping function to facilitate rapid deployment of demand management control to groups of meters, provide dynamic meter group definitions, and provide firmware updates.

81.   The Grid IQ AMI System relies on one or more wireless networks to communicate with the endpoints, where the wireless networks include power line communication (PLC) system components, mesh network components, cellular network components, access points, subscriber units, and other endpoints.

82.   During operation of the Grid IQ AMI System, GE processes endpoint addresses, endpoint group addresses, outgoing communications, and incoming acknowledgment responses.

83.     Actions may be performed on one or more groups of Grid IQ AMI System endpoints.

84.     GE has applied for and been granted patents that describe its Grid IQ AMI Systems.

85.     GroupChatter has been damaged as a result of Defendant's infringing conduct described in Count 1.  GE is liable to GroupChatter in an amount that adequately compensates it for GE's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

86.     GE's infringement of the '959 Patent has been willful at least since service of this suit, and consequently GE is liable to GroupChatter for enhanced damages.

## COUNT 2
### (INFRINGEMENT OF U.S. PATENT NO. 8,199,740)

87.     GroupChatter incorporates paragraphs 1 through 89 herein by reference.

88.     GroupChatter is the owner, by assignment, of U.S. Patent No. 8,199,740 (the "'740 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

89.     A true and correct copy of the '740 Patent is attached as Exhibit B.

90.    As the owner of the '740 Patent, GroupChatter holds all substantial rights in and under the '740 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

91.    The United States Patent Office granted the '740 Patent on June 12, 2012.

92.    The '740 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

93.    GE is practicing one or more claims of the '740 Patent, including at least claims 1, 2, 3, 4, 5, 10, 11, 12, 13, 14, 15, 20, and 21, by making, using, offering for sale, selling, and/or importing components and systems for alerting groups of recipients over a wireless network.

94.    GE has directly infringed and continues to infringe the '740 Patent by practicing one or more claims of the '740 Patent, including at least claims 1, 2, 3, 4, 5, 10, 11, 12, 13, 14, 15, 20 and 21, by deploying, testing, and operating the Grid IQ AMI System and its subsystems that provide a deterministic group messaging system through which GE alerts groups of recipient endpoints over a wireless network.

95.    GE indirectly infringes the asserted claims of the '740 Patent by

contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System for use and GE indirectly infringes the asserted claims of the '740 Patent by contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System for use and deployment together and having no substantial non-infringing use.

96.   GE knowingly induces others, namely GE's customers such as gas, water, and electric utilities, to infringe the asserted claims by encouraging, aiding, and abetting the use, deployment, assembly, installation, and operation of the accused Grid IQ AMI System and components.

97.   Hardware and software in the GE Grid IQ AMI Systems for performing deterministic group communication is dedicated to that function and has no other use of any significance.

98.   Group managers on endpoints store group membership data and analyze inbound group messages targeting a particular group of meters.  If the meter belongs to the target group, it executes the direct load control function and acknowledges the group message.  The group manager has no substantial non-infringing use.

99.   At the head end system, a Grid IQ data aggregator implements group management of meter endpoints.

100.   Once groupings are implemented, the Grid IQ data aggregator can implement data transmission directives (e.g., public pricing messages), data collection directives (e.g., daily use data), or other directives from the head end system as a broadcast or multicast signals that address a group of utility meters.

101.   The Grid IQ data aggregator's group messaging components at the head end system have no substantial non-infringing use.  They are designed and used to perform deterministic group messaging as recited in the asserted claims.

102.   GE knowingly induces others, namely GE's customers such as gas, water, and electric utilities, to infringe the asserted claims by encouraging, aiding, and abetting the use, deployment, assembly, installation, and operation of the accused Grid IQ AMI System and components.

103.   GE has been aware of the GroupChatter Patents and how the Accused Instrumentalities infringe them at least since the filing of this suit and has had specific knowledge of its infringing conduct. Despite having such knowledge, GE continues to sell infringing Grid IQ AMI Systems and components and induce, deploy, encourage, aid, and abet others to directly infringe the asserted claims of the '740 Patent.

104.   Grid IQ AMI System endpoints are capable of transmitting and receiving data wirelessly.

105.   GE stores and processes endpoint and group addresses for multiple endpoints.

106.   GE provides endpoints with data by broadcasting outgoing communications to the endpoints and processes incoming acknowledgments when it operates the Grid IQ AMI System and related subsystems.

107.   The Grid IQ AMI System and related subsystems are a deterministic group messaging system for providing acknowledged group messaging.

108.   GroupChatter has been damaged as a result of Defendant's infringing conduct described in Count 2.   GE is liable to GroupChatter in an amount that adequately compensates it for their infringement, which amount, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

109.   GE's infringement of the '740 Patent has been willful at least since service of this suit, and consequently GE is liable to GroupChatter for enhanced damages.

### COUNT 3
### (INFRINGEMENT OF U.S. PATENT NO. 8,588,207)

110.   GroupChatter incorporates paragraphs 1 through 113 herein by reference.

111.   GroupChatter is the owner, by assignment, of U.S. Patent No.

8,588,207 (the "'207 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

112.   A true and correct copy of the '207 Patent is attached as Exhibit C.

113.   As the owner of the '207 Patent, GroupChatter holds all substantial rights in and under the '207 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

114.   The United States Patent Office granted the '207 Patent on November 19, 2013.

115.   The '207 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

116.   GE is practicing one or more claims of the '207 Patent, including at least claims 1, 2, 3, 8, 9 and 11, by making, using, offering for sale, selling, and/or importing the Grid IQ AMI System and its subsystems that provide a deterministic group messaging system through which GE alerts groups of recipients over a wireless network.

117.   GE has directly infringed and continues to infringe the '207 Patent by deploying, testing, and operating the Grid IQ AMI System that provides acknowledged group messaging with endpoints (e.g., utility meters) in the Grid IQ

AMI System.

118.   GE indirectly infringes the asserted claims of the '207 Patent by contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System for use and GE indirectly infringes the asserted claims of the '207 Patent by contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System for use and deployment together and having no substantial non-infringing use.

119.   GE knowingly induces others, namely GE's customers such as gas, water, and electric utilities, to infringe the asserted claims by encouraging, aiding, and abetting the use, deployment, assembly, installation, and operation of the accused Grid IQ AMI System and components.

120.   GE has been aware of the GroupChatter Patents and how the Grid IQ AMI system infringes them at least since the filing of this suit and has had specific knowledge of its infringing conduct. Despite having such knowledge, GE continues to sell infringing Grid IQ Systems and components and induce, deploy, encourage, aid, and abet others to directly infringe the asserted claims of the '207 Patent.

121.   GE processes endpoint and group identifiers, provides the endpoints with related data, wirelessly transmits outgoing communications to the endpoints,

and processes incoming acknowledgments when it operates the Grid IQ AMI System and related subsystems.

122.   The Grid IQ AMI System and related subsystems are a deterministic group messaging system and provide acknowledged group messaging.

123.   GroupChatter has been damaged as a result of Defendant's infringing conduct described in Count 3.   GE is liable to GroupChatter in an amount that adequately compensates it for their infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

124.   GE's infringement of the '207 Patent has been willful at least since service of this suit, and consequently GE is liable to GroupChatter for enhanced damages.

## COUNT 4
## (INFRINGEMENT OF U.S. PATENT NO. 9,014,659)

125.   GroupChatter incorporates paragraphs 1 through 128 herein by reference.

126.   GroupChatter is the owner, by assignment, of U.S. Patent No. 9,014,659 (the "'659 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

127.   A true and correct copy of the '659 Patent is attached as Exhibit D.

128.   As the owner of the '659 Patent, GroupChatter holds all substantial rights in and under the '659 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

129.   The United States Patent Office granted the '659 Patent on April 21, 2015.

130.   The '659 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

131.   GE is practicing one or more claims of the '659 Patent, including at least claims 1, 2, 3, 4, 8, 10, 11, 12, 13 and 16, by making, using, offering for sale, selling, and/or importing the Grid IQ AMI System and its subsystems that provide a deterministic group messaging system through which GE alerts groups of recipients over a wireless network.

132.   GE has directly infringed and continues to infringe the '659 Patent by deploying, testing, and operating the Grid IQ AMI System that provides acknowledged group messaging with endpoints in the Grid IQ AMI System.

133.   In operation, the Grid IQ AMI System provides acknowledged group messaging.

134.   The Grid IQ AMI System stores an identifier for a plurality of

endpoints.

135.   The Grid IQ AMI System provides for grouping of endpoints and assignment of a group identifier to a group of endpoints.

136.   The Grid IQ AMI System wirelessly transmits data to endpoints.

137.   The Grid IQ AMI System processes incoming acknowledgments from endpoints within a group.

138.   The Grid IQ AMI System and related subsystems monitor for responses from endpoints to group message transmissions.

139.   The Grid IQ AMI System and related subsystems are a deterministic group messaging system for providing acknowledged group messaging.

140.   GE indirectly infringes the asserted claims of the '659 Patent by contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System for use and GE indirectly infringes the asserted claims of the '659 Patent by contributing to the infringement of others by knowingly providing component parts of the Grid IQ AMI System for use and deployment together and having no substantial non-infringing use.

141.   GE knowingly induces others, namely GE's customers such as gas, water, and electric utilities, to infringe the asserted claims by encouraging, aiding, and abetting the use, deployment, assembly, installation, and operation of the

accused Grid IQ AMI System and components.

142.   GE has been aware of the GroupChatter Patents and how the Grid IQ AMI system infringes them at least since the filing of this suit and has had specific knowledge of its infringing conduct. Despite having such knowledge, GE continues to sell infringing Grid IQ Systems and components and induce, deploy, encourage, aid, and abet others to directly infringe the asserted claims of the '659 Patent.

143.   GE processes endpoint and group identifiers, provides the endpoints with related data, wirelessly transmits outgoing communications to the endpoints, and processes incoming acknowledgments when it operates the Grid IQ AMI System and related subsystems.

144.   The Grid IQ AMI System and related subsystems are a deterministic group messaging system and provide acknowledged group messaging.

145.   GroupChatter has been damaged as a result of GE's infringing conduct described in Count 4. GE is liable to GroupChatter in an amount that adequately compensates it for their infringement, which compensation, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

146.   GE's infringement of the '659 Patent has been willful at least since

service of this suit, and consequently GE is liable to GroupChatter for enhanced damages.

## NOTICE

147.   GroupChatter does not currently distribute, sell, offer for sale, or make products embodying the asserted GroupChatter Patents.

148.   GroupChatter instructs its licensees to mark all licensed products sold, distributed, offered for sale, or made under license to the GroupChatter Patents and undertaken reasonable efforts as required to comply with the notice requirements of 35 U.S.C. § 287.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

149.   GE is hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that GE knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

150.   As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of GE's agents, resellers, or employees if GE's electronically stored information resides there.

151.  GE is hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential

Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to GE's claims and/or defenses. To avoid such a result, GE's preservation duties include, but are not limited to, the requirement that GE immediately notify its agents and employees to halt and/or supervise the auto-delete functions of GE's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

152.   GroupChatter hereby demands a trial by jury on all claims, issues and damages so triable.

## PRAYER FOR RELIEF

153.   GroupChatter prays for the following relief:

    a.   That GE be summoned to appear and answer;

    b.   That the Court enter an order declaring that GE has infringed the '959 Patent, the '740 Patent, the '207 Patent, and the '659 Patent.

    c.   That the Court grant GroupChatter judgment against GE for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre and post-judgment interest as allowed by law; and reasonable

attorney's fees, costs, and expenses incurred in this action;

   d.  That GE's infringement has been willful; and

   e.  That GroupChatter be granted such other and further relief as the

Court may deem just and proper under the circumstances.

Dated:  August 12, 2016          Respectfully submitted,

          By:   */s/Daniel A. Kent*
               Daniel A. Kent
               Georgia Bar Number 415110
               dankent@kentrisley.com
               **KENT & RISLEY LLC**
               555 N Point Ctr E Ste 400
               Alpharetta, GA 30022
               Tel:  (404) 585-4214
               Fax:  (404) 829-2412

               Cabrach J. Connor (pro hac vice)
               cconnor@taylordunham.com
               David E. Dunham (pro hac vice)
               ddunham@taylordunham.com
               Jennifer Tatum Lee (pro hac vice)
               jtatum@taylordunham.com
               **TAYLOR DUNHAM AND RODRIGUEZ LLP**
               301 Congress Ave., Suite 1050
               Austin, Texas  78701
               512.473.2257 Telephone
               512.478.4409 Facsimile

               **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

This 12th day of August, 2016.

/s/*Daniel A. Kent*
Daniel A. Kent